Filed 5/4/15  In re Jospeh M. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JOSEPH M., et al., Persons Coming Under the Juvenile Court Law. | B256877 |
| | (Los Angeles County Super. Ct. No. CK45933) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent. v. JOSELYN H., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Carlos E. Vasquez, Judge.  Affirmed.

Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Stephen D. Watson, Deputy County Counsel for Plaintiff and Respondent.

Joselyn H. (mother) appeals from an order denying her petition requesting reunification services and unmonitored visitation, filed pursuant to Welfare & Institutions Code section 388.[1] Mother contends that the juvenile court abused its discretion by denying her petition because she showed both a change of circumstances and that granting the petition would be in the best interests of her four children. We find no abuse of discretion in the trial court's order and therefore affirm.

## COMBINED STATEMENT OF THE CASE AND FACTS

The family consists of mother, Octavio M. (father),[2] and four children: Joseph M. (born Sept. 2007); J.M. (born Dec. 2008); Octavio M., Jr. (born Dec. 2010); and Abbie M. (born April 2012).

**Initial referral and investigation**

The family came to the attention of the Los Angeles Department of Children and Family Services (DCFS) on October 31, 2011, when DCFS received a referral alleging that the parents were physically fighting almost every day after using crystal methamphetamine. A DCFS social worker met with mother privately on the same day, but mother denied the allegations of domestic violence. Mother admitted she and father had past experience with domestic violence but they had learned to address these issues without the use of force. Father also denied the allegations.

On December 29, 2011, the parents agreed to a voluntary family maintenance plan. The parents agreed to refrain from violence and controlled substance use, and to actively participate in services to address family and partner issues. DCFS noted that mother had lost her two older children, Herman T. and Crystal M. in a prior juvenile dependency proceeding which involved issues of physical abuse and domestic violence. The two older children were adopted by maternal grandmother (MGM) after the parental rights of mother and father were terminated.

---

[1] All further statutory references are to the Welfare & Institutions Code.

[2] Father is not a party to this appeal.

When a DCFS social worker visited with mother and the children on January 10, 2012, she observed that mother's eye was swollen and red and mother was bruised on her neck and arms. Mother claimed she and father had a verbal altercation the day before and a neighbor called the police. The police took father to jail but mother was certain father was going to be released because he was not the abuser. Mother denied that she and father had a physical altercation and attributed her swollen eye to a spider bite.

The social worker visited father at the police station where he also denied domestic violence but stated he held mother down to prevent her from harming him. Father said that mother's swollen eye was from a bug bite.

The arresting officer informed the social worker that an eyewitness saw father hit mother in the eye during their argument on January 9, 2012. The witness also observed father holding and shaking mother. In addition, mother provided a false name to the police when they arrived. DCFS noted that mother may have provided a false name because there was an active warrant out for her arrest. Mother would not cooperate with law enforcement, and declined to seek a restraining order to protect the children. DCFS opined that mother and father were minimizing their issue with domestic violence and were putting the children's safety and emotional wellbeing at risk.

On January 19, 2012, mother was arrested on two active warrants. Joseph, J. and Octavio were detained.

**Section 300 petition and detention hearing**

On January 24, 2012, DCFS filed a section 300 petition alleging under subdivision (b) that mother failed to protect Joseph, J. and Octavio from domestic violence. The juvenile court held a detention hearing the same day, which mother did not attend. The court detained the children and gave DCFS discretion to place them with any appropriate relative or extended family member. Mother was granted monitored visits.

Joseph was placed with paternal aunt V.M., while J. and Octavio were placed with paternal aunt A.M.

3

**Jurisdiction/disposition report**

On March 2, 2012, DCFS filed a jurisdiction/disposition report noting that initially mother refused to personally meet with the social worker due to an open arrest warrant for mother. The social worker then interviewed mother telephonically. Though mother continued to deny any current domestic violence, she admitted she and father engaged in verbal altercations, but not while the children were home. DCFS was unable to schedule visitation for mother with her children as mother remained on the run from law enforcement and expressed concern about being arrested on her outstanding warrant. Mother was not enrolled in any services or programs, although DCFS had provided referrals for parent education, individual and family counseling, and drug testing.

Mother and father's neighbor was also interviewed. The neighbor's front door faced the parent's front door providing a clear view into the parents' residence, which was open when the parents started fighting on January 9, 2012. The neighbor observed father hitting mother all over with a belt. The neighbor characterized this as "routine" behavior. He got tired of it and called the police. The neighbor observed father punch mother in the face. He stated that mother tells father to stop but then covers for him. The neighbor observed that mother is a great mother when she is alone, she is "peaceful and plays outside with her children." However, when father is present things change.

The neighbor and the parents had been neighbors for approximately one year during which time the parents' verbal and physical altercations would take place "at least [four] times per week."

Mother made her first appearance in the case at the March 2, 2012 pretrial resolution conference, when the juvenile court granted her four hours of monitored visitation per week and set the adjudication for April 4, 2012.

**Interim review report**

DCFS filed an interim review report on March 28, 2012. Joseph, then four and a half years old, had been interviewed. The social worker determined that Joseph was not able to distinguish the difference between the truth and a lie. However, Joseph said he saw father hit mother on the arm. He said they fight a lot. Then three-year-old J., who

4

also was not able to distinguish the truth from a lie, also stated that father hit mother, but was unable to provide any further statements as to the allegations. Octavio was too young to be interviewed.

## Adjudication

On April 4, 2012, the juvenile court sustained a single count under section 300, subdivision b.[3] The children were declared dependents of the court and removed from parental custody. Mother was granted monitored visits and, over the objection of DCFS, both parents were provided with reunification services.[4] Mother was ordered to participate in DCFS-approved individual counseling to address domestic violence and other case issues, a domestic violence support group for victims, and parenting classes. The court set a six-month review hearing for November 8, 2012.

## Abbie's birth and section 300 petition

Mother gave birth to Abbie in April 2012. Hospital staff informed DCFS that mother gave false and inconsistent information regarding her name, address, and medical insurance, and was anxious to leave the facility with the baby. Mother had tested positive for opiates, although she claimed she had been prescribed Vicodin.

---

[3] The following allegation was sustained: "B-1 [¶] The children['s] . . . mother . . . and father . . . have a history of engaging in violent altercations. On 1/9/2012, the father struck the mother's face with the father's fists inflicting swelling and bruising to the mother's eye. The father also caused the mother to sustain scratches and bruising to the mother's arms. The mother failed to protect the children in that the mother denied the father's physical assault against the mother to law enforcement officers. The father was arrested for corporal injury to a spouse. Such violent conduct on the part of the father against the mother and the mother's failure to protect the children endangers the children's physical health and safety and places the children at risk of harm."

[4] DCFS objected to the provision of reunification services under section 361.5, subdivision (b)(10), which states that reunification services need not be provided to a parent if the court has previously ordered termination of reunification services for any sibling or half sibling of the child because the parent or guardian failed to reunify with the sibling or half sibling, and the parent has not made a reasonable effort to treat the problems that led to the removal of that sibling.

5

When interviewed, mother denied using controlled substances during her pregnancy, except Vicodin which was prescribed by her dentist. She admitted using crack cocaine and marijuana five years earlier. Mother said that two weeks before giving birth to Abbie, she was participating in a program at U-Turn Alcohol and Drug Education but had not returned to the program since Abbie's birth. The social worker verified mother's enrollment in the U-Turn program. Mother tested positive for opiates when she enrolled. The social worker also confirmed that mother had been prescribed Vicodin by her dentist in February 2012, but upon learning that mother was pregnant the dentist had told mother to stop taking the drug.

On April 13, 2012, DCFS filed a section 300 petition on behalf of Abbie, and the juvenile court detained the child in foster care.[5] Abbie was placed with non-relative extended family members Joe and Lucia C.

**Jurisdiction/disposition regarding Abbie**

On May 8, 2012, DCFS filed a jurisdiction report regarding Abbie. On May 2, 2012, mother informed DCFS of her two outstanding warrants, one for providing a false identification to the police when she was caught shoplifting, and one for leaving a court-mandated drug treatment program. DCFS also reported on mother's mental health history: mother had been previously diagnosed with bipolar disorder, and had a history of depression, mood swings, and suicide attempts. Mother also reported she was sexually, emotionally, and physically abused throughout her life. She claimed to have

---

[5] The petition filed on behalf of Abbie contained a single count under subdivision (j), abuse of sibling, which read: "The child['s] . . . mother . . . and father . . . have a history of engaging in violent altercations. On 1/9/2012, the father struck the mother's face with the father's fists inflicting swelling and bruising to the mother's eye. The father also caused the mother to sustain scratches and bruising to the mother's arms. The mother failed to protect the child's siblings . . . in that the mother denied the father's physical assault against he mother to law enforcement officers. The father was arrested for corporal injury to a spouse. Such violent conduct on the part of the father against he mother and the mother's failure to protect the child's siblings endangers the child's physical health and safety and places the child at risk of harm.

been recently placed back on psychotropic medication with the help of Tarzana Treatment Center.

Mother's criminal background check revealed that she was convicted of theft in 2001 and 2004, driving with a suspended license in 2002, petty theft and grand theft in 2008, and petty theft in 2012. There were also outstanding arrest warrants for false impersonation, grand theft, and petty theft.

On May 21, 2012, the juvenile court sustained Abbie's section 300 petition under subdivision (j). The disposition hearing was set for August 6, 2012.

On June 28, 2012, DCFS reported that mother had been discharged from Tarzana Treatment Center on May 21, 2012, for violating several rules. Codeine and a cell phone were found in mother's room. Cell phones were not allowed in the program, and mother did not have authorization to have the Codeine medication. Mother also cheated on her medications and violated the program's curfew.

On May 23, 2012, mother was arrested and detained at the Regional Detention Facility in Lynwood, California. According to a paternal aunt, mother had been arrested for stealing and identity theft after being caught shoplifting at a grocery store.

At the August 6, 2012 disposition hearing, the juvenile court declared Abbie a dependent, removed her from parental custody, granted mother four hours of monitored visitation per week, and ordered reunification services over DCFS's objection. Mother was ordered to participate in a domestic violence support group for victims, parenting classes, and individual counseling to address domestic violence and other case issues. A six-month review hearing was set for February 5, 2013.

**Six-month review hearings**

DCFS filed a status review report on November 8, 2012. Mother had begun participating in the Los Angeles County Jail's Merit Beginnings program on August 14, 2012. Merit Beginnings was an optional six-week course for inmates focusing on personal relationships, parenting, drug education, leadership, and job skills. Mother had not, however, completed any court-ordered programs.

7

Prior to her incarceration, mother had been fairly consistent with visiting the children. After her incarceration, J. and Octavio had visited mother only once. J. reacted badly to the visit and they had not visited since. Joseph had not visited mother.

At the six-month review hearing for Joseph, J. and Octavio on November 8, 2012, the juvenile court found mother in partial compliance with her case plan and ordered further reunification services. The 12-month review hearing was set for August 28, 2013.

In December 2012, DCFS was informed that mother was transferred to the Central California Women's Facility in Chowchilla, California.

The six-month review hearing for Abbie took place on February 5, 2013. The juvenile court found that continued jurisdiction was necessary because mother's progress was minimal.

**Mother's progress while incarcerated**

On March 22, 2013, DCFS reported that mother had been transferred to the California Institute for Women (CIW) in Corona, California. She was enrolled in several programs at CIW, including parenting classes, an anger management program, life skills classes, a substance abuse program, and a support group.

In July 2013, DCFS reported that mother had completed CIW's 12-week anger management and parenting programs. In addition, mother completed a basic course in nonviolent conflict resolution, and received a certificate of appreciation for participating in CIW's substance abuse program from March 21, 2013 to June 21, 2013.

**Twelve-month review hearing**

In its interim review report filed in July 2013, DCFS recommended termination of reunification services for mother. DCFS cited mother's extensive history of substance abuse, and also noted that mother previously failed to reunify with two older children. DCFS explained that mother was unable to maintain sobriety outside of a controlled environment, and noted that mother had previously escaped from a drug treatment program and had used false impersonation. Specifically, DCFS stated: "Mother has had eighteen months to complete all of her Court Ordered Services. Prior to her

8

incarceration, mother did not complete or remain actively enrolled in any of her services. Mother is enrolled into services at this time, because she is in a controlled environment."

The 12-month review hearing for all the children took place on August 28, 2013. The court found that mother was in partial compliance with the case plan. The parents were advised that the court may consider termination of parental rights at the next hearing, and that all four minors were adoptable. The court found that the parents had not consistently and regularly visited with the children, had not made significant progress in resolving the problems that led to the children's removal from the home, and had not demonstrated the capacity and ability to complete the objectives of the treatment plans and provide for the well-being of the children. The court further found that there was not a substantial probability that the children would be returned to the parents' custody within the next period of review, therefore it terminated reunification services.

The juvenile court set the matter for a section 366.26 hearing on January 2, 2014.

DCFS filed a section 366.26 report which indicated that all of the children's respective caregivers were interested in adoption. DCFS requested that the court hearing be continued so that DCFS could complete the adoption home studies. The matter was continued to May 1, 2014.

**Mother's continued progress while incarcerated**

Mother completed her substance abuse program on August 30, 2013, a parenting program on September 24, 2013, a parenting education program in December 2013, and an advanced level Alternatives to Violence workshop on December 22, 2013.

On February 12, 2014, DCFS received a letter from the Second Call Anger Management/Domestic Violence program, indicating mother had attended five sessions of individual case management and five domestic violence support groups since August 7, 2013.

**Mother's section 388 petition**

Mother filed a section 388 petition on March 19, 2014, requesting reinstatement of reunification services and unmonitored visitation. Mother alleged the following changed circumstances: she had been released from custody on March 19, 2014. She completed

9

two parenting classes, two domestic violence programs, participated in individual counseling, and although not in her case plan, completed anger management and substance abuse programs. Mother had visits with her children and called her children regularly while incarcerated. Mother had a stable home with family.

Mother claimed that her requested changes were in the best interests of the children because the children have a bond with her and she believed that with six additional months of reunification she could successfully reunify with all four children.

Mother attached the following documents to her section 388 petition: (1) a letter dated March 28, 2013, confirming that mother had enrolled in a substance abuse program on March 21, 2013; (2) a certificate of completion dated June 18, 2013, for the Heart2Heart Support Services 12-week parenting program; (3) a certificate of completion dated June 19, 2013, for the Heart2Heart Support Services 12-week anger management program; (4) a certificate of appreciation dated June 21, 2013, from HPC Above the Horizon substance abuse prevention program, recognizing mother's participation in the program from March 21, 2013 to June 21, 2013; (5) certificates of completion dated July 28, 2013 and August 23-25, 2013, for Alternatives to Violence Project's basic course in nonviolent conflict resolution; (6) a certificate of completion dated August 30, 2013, for CIW's substance abuse treatment program; (7) a certificate of completion dated September 19, 2013, for the Friends Outside parenting program; (8) a letter dated December 22, 2013, indicating that mother participated in a 20-hour advanced level Alternatives to Violence workshop; (9) a letter dated February 12, 2014, from 2nd Call indicating that mother participated in its anger management/domestic violence program from August 7, 2013 through September 11, 2013; and (10) an undated certificate of completion from CIW's Amity Foundation recognizing mother's completion of assignments with Amity from March 21, 2013 to August 30, 2013.

The juvenile court set a hearing on mother's section 388 petition for May 23, 2014.

**Status report and section 388 response**

DCFS filed a status report on May 1, 2014, and a status report/response to mother's section 388 petition on May 8, 2014. DCFS reported that the children had been visiting mother on a monthly basis since May 2013, and on a weekly basis since mother's March 19, 2014 release from prison. Abbie's caregiver reported that Abbie did not recognize mother and would say "No, no" when mother extended her arms. On a visit in April 2014, mother spent 40 minutes talking on her cell phone while the children played with each other. On some visits, mother brought an adult female friend who mother claimed was her aunt or cousin. Abbie's caregiver said the adult friend was mother's former lover. Abbie's caregiver also stated that mother had once asked her for $40 without specifying why.

The clinical manager at mother's sober living home reported that mother was working 40 hours per week, did her chores, and had no behavioral issues. Depending on their ages and length of stay, it was possible for the children to stay at the home with mother.

DCFS recommended that the section 388 petition be denied. DCFS noted that the children had been in stable homes since detention, and all of the caregivers were committed to providing the children with permanent homes through adoption. Octavio and Abbie had special needs that were being met by their respective caregivers. Mother never asked about the children's special needs or services.

DCFS pointed out that mother had an extensive history with DCFS going back to 2001. Mother's parental rights to her two oldest children were terminated and they were adopted by the maternal grandmother. Mother had not shown a commitment to change. She did not begin participating in court-ordered services until she was incarcerated, and she had not demonstrated a full commitment to the children since her release.

DCFS opined that it was not in the children's best interests to delay permanence, when mother had yet to demonstrate that she was committed to, or able to, provide for the children.

On May 23, 2014, DCFS provided a last minute information for the court that several recent Facebook postings called into question mother's commitment to sobriety and lifestyle change. On May 4, 2014, mother posted the statement "Happy 5 de mayo raza chilling drinking dos equis. Dos a rita. Have a boom ass Sunday." On May 16, 2014, mother posted a picture of herself holding a Modelo beer can. On the morning of May 18, 2014, mother posted a picture of Joseph with the statement, "G morning my firme raza may all of you have a good one. On my [*sic*] to see my handsome angel & may god be with all of u enjoy." That evening, mother posted a picture of a Dos Equis beer can with the statement, "G nite mi firme raza my [*sic*] all of u have a blessed night. I truly hope all of u had a firme weekend." DCFS also advised the court that all of the children's caregivers had expressed strong concerns about mother reunifying with the children. In particular, Abbie's caregivers provided a lengthy email noting, among other things, that the children did not acknowledge mother during visits and that mother had confessed to Abbie's caregivers that she used drugs while she was pregnant with Abbie. Abbie referred to her caregivers as mom and dad. In addition, Abbie was attending therapy at the regional center three to four times a week. Mother had never participated in any of those therapies, nor asked to participate.

**Hearing on section 388 petition**

The juvenile court considered mother's section 388 petition on May 23, 2014. Counsel for mother argued that a change of circumstances had been shown because mother had participated in individual counseling, completed two parenting classes and two domestic violence programs, and participated in programs for anger management, substance abuse, life skills, victims of violence, and convicted women against violence. Counsel also argued that it was in the children's best interests to reunify with mother.

Counsel for the children joined with counsel for DCFS in asking that the section 388 petition be denied.

While the juvenile court believed that mother's progress may be indicative of changing circumstances, she failed to demonstrate changed circumstances by a preponderance of the evidence. In addition, the juvenile court agreed that it would not be

in the best interests of the children to grant any of mother's requests. The children had been out of mother's care for an extended period of time and were attached to their respective caregivers. In sum, the court found that mother had not demonstrated under either prong of section 388 that her request should be granted.

On June 6, 2014, mother filed her notice of appeal from the juvenile court's order denying her section 388 petition.

## DISCUSSION

### I. Applicable law and standard of review

Section 388 provides, in relevant part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made." "Section 388 provides the 'escape mechanism'. . . built into the process to allow the court to consider new information. [¶] . . . Even after the focus has shifted from reunification, the scheme provides a means for the court to address a legitimate change of circumstances . . . . [¶] . . . [T]he Legislature has provided the procedure pursuant to section 388 to accommodate the possibility that circumstances may change after the reunification period that may justify a change in a prior reunification order." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

That being said, "[i]t is not enough for a parent to show *just* a genuine change of circumstances under the statute. The parent must show that the undoing of the prior order would be in the best interests of the child. [Citation.]" (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529; § 388, subd. (b).) "[T]he burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change . . . in the best interests of the child. [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

"'Whether a previously made order should be modified rests within the dependency's court's discretion, and its determination will not be disturbed on appeal unless an abuse of discretion is clearly established.' [Citation.]" (*In re Amber M.* (2002)

103 Cal.App.4th 681, 685.)  "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deducted from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'  [Citations.]"  (*In re Stephanie M., supra*, 7 Cal.4th at pp. 318-319.)  Thus, we will not reverse a juvenile court's denial of a section 388 petition ""'"unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].""  [Citations.]"  (*Stephanie M.*, at p. 318.)

## II.  The juvenile court did not abuse its discretion in denying mother's section 388 petition

In her section 388 petition, mother argued that her release from custody and completion of most of her court-ordered programs constituted a change of circumstances sufficient for a modification of the court's order terminating reunification services.  Mother further argued that her proposed changes were in the best interests of her children because the children have a bond with her and she believed she could successfully reunify with them.

### A.  Change of circumstances

Mother argues that DCFS minimizes her extraordinary efforts to avail herself of services while incarcerated.  Mother argues that given the year of continuous participation in services required, and her cooperative attitude while engaged in those services, mother demonstrated the change of circumstances required by section 388.  Mother argues that the juvenile court erred in describing her circumstances as changing, rather than changed.

DCFS responds that mother's recent completion of court-ordered services must be viewed in the context of the proceedings as a whole.  DCFS points out that mother did nothing to complete her reunification requirements until she was incarcerated.  And, while she did eventually enroll in individual counseling, it took her two years to do so.  DCFS points out that mother's circumstances have remained the same for over a decade, starting with the detention of her oldest child in 2001.  Despite losing her two oldest

14

children to adoption, mother continued to expose her children to domestic violence. After a violent altercation in the children's presence in January 2012, mother gave a false name to the police and refused to cooperate. Despite having a swollen right eye and bruises to her neck and arms, mother denied having a physical altercation with father. It was not until she was incarcerated that mother participated in programs. Under the circumstances, DCFS argues, mother's completion of these programs and delayed enrollment in individual counseling cannot be considered changed circumstances.

To support a section 388 petition, the change in circumstances must be substantial. (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 [mother's recent sobriety and completion of a drug treatment program did not constitute a substantial change of circumstances].) As DCFS points out, mother has a long history of problems with domestic violence. Her completion of her court-ordered programs during incarceration is commendable, but does not demonstrate a substantial change of circumstances. (*Ibid.*) This is especially true given mother's recent Facebook postings, which reveal that she had not implemented true change after completing substance abuse programs.

In support of her argument that she has demonstrated changed circumstances, mother cites *In re Mary G.* (2007) 151 Cal.App.4th 184, 205-206 (*Mary G.*). In *Mary G.*, the mother sought a change of order under section 388 because she had completed a detoxification program, was in drug treatment, was attending NA meetings, and was seeking mental health treatment. The juvenile court's determination that the mother had not demonstrated changed circumstances was affirmed. Mother argues that her situation is different because, in contrast to the mother in *Mary G.*, she had completed all but the individual counseling component of her case plan. While mother is correct that she made more progress than the mother in *Mary G.*, there are also several similarities between the two situations. Like the mother in *Mary G.*, mother had for many years engaged in behavior that was detrimental to her children -- a pattern which continued even after she lost custody of her two oldest children. And, like the mother in *Mary G.*, mother did not engage in rehabilitative services when her children were removed from her. Her participation in services was brief compared to the length of time she dealt with issues of

15

domestic violence.  In addition, mother's behavior on visits with the minors and her recent Facebook postings showed that mother had not made a significant change in her commitment to the children or to sobriety.

The record supports the juvenile court's finding that mother did not demonstrate changed circumstances.  Instead, she showed only changing circumstances.  The juvenile court did not abuse its discretion in determining that modification of the existing order was not warranted.

### B.  *Best interests of children*

In order to prevail on a section 388 petition, mother was required to show not only significant changed circumstances, but also that a change of order would be in the children's best interests.  (*In re Daijah T.* (2000) 83 Cal.App.4th 666, 672.)  We have determined that mother failed to show changed circumstances warranting a change of order.  We further conclude that even if mother had made such a showing, she failed to demonstrate that an order providing mother with further reunification services and unmonitored visitation would be in the children's best interests.

The factors to be considered when determining a child's best interest were discussed in *In re Kimberly F.* (1997) 56 Cal.App.4th 519.  The factors include:  (1) the seriousness of the problem which led to dependency; (2) the strength of the relative bonds between the dependent children to both parent and caretakers; and (3) the degree to which the problem is easily removed or ameliorated.  (*Id.* at p. 532.)

Mother argues that these factors weigh in favor of granting her section 388 petition.  Mother argues that she eliminated the problem that led to the dependency when she participated in programs while incarcerated.  Mother points out that she did not return to father after her release from custody, but was living on her own, working, and engaged in individual counseling.

As to the second prong, mother argues that the three older children were living with her before they were removed, and that mother had visitation with all of the children while she was in custody and after her release.  As to Abbie's caretakers' claim that mother never asked about or participated in special services for Abbie, mother argued

16

that the caretakers admitted that mother always asked about Abbie. If the caretakers did not provide mother with information about Abbie's services, mother argues, it was not because mother did not give them the opportunity.

Mother cites *In re Sean E.* (1992) 3 Cal.App.4th 1594 for the proposition that some dependency cases necessitate additional time so that the changing relationship between the minors and the parent can be examined. (*Id.* at p. 1599.) Mother argues that it is in the best interests of the children to allow her the opportunity to build on the relationship she already had with the older children and which she had begun with Abbie.

The juvenile court "strongly agree[d]" with the children's counsel that mother's requested changes would not be in the best interests of the children. The court stated: "they have been out of the mother's care for an extended period of time, and as the report indicated, they are attached to the caregivers, and the court simply does not find that it would be in the best interest of the children to grant any of the mother's requests . . . 28 months have already passed since family reunification was instituted."

The record supports the juvenile court's discretionary decision. Mother had a long history of trouble with domestic violence, which led to the loss of her two oldest children to adoption. The three older children involved in this proceeding had been with their respective caretakers for over two years, were doing well, and were likely to be adopted. Abbie had been with her caretakers since her birth in April 2012. There was evidence that during visits the children were not engaged with mother and that mother acted inappropriately. The children's caregivers all had concerns about mother being granted further reunification services. Granting mother's request for further reunification services would further delay permanency planning for the children, who were in stable placements with caregivers committed to adoption. In addition, there was evidence that granting mother's request for unmonitored visits was contrary to the best interests of the children, especially because the children did not appear bonded to mother; she talked on her cell phone during visits; and she brought unidentified companions to the visits.

During the pendency of this proceeding it became apparent that mother's bond with the children was secondary to the children's bonds with their caretakers. This is

17

especially true of Abbie, who never lived with mother.  In addition, mother's issues with domestic violence were longstanding and not easily ameliorated, especially considering that she continued to remain victim to this problem even after her two oldest children were adopted.  Under the circumstances we find that the juvenile court did not abuse its discretion in determining that mother's requested changes under section 388 were not in the best interests of the children.

## DISPOSITION

The order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST